**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

|                                  |   |                        |
|----------------------------------|---|------------------------|
|                                  | : |                        |
|                                  | : |                        |
| ROSE TOOKES,                     | : |                        |
|                                  | : |                        |
|               Plaintiff,         | : | CIVIL ACTION NO.       |
|                                  | : | 1:04-CV-1957-RWS       |
|          v.                      | : |                        |
|                                  | : |                        |
| METROPOLITAN LIFE                | : |                        |
| INSURANCE COMPANY;               | : |                        |
| SEARS, ROEBUCK and               | : |                        |
| COMPANY; and SEARS GROUP         | : |                        |
| LONG TERM DISABILITY             | : |                        |
| PLAN, a welfare benefit plan,    | : |                        |
|                                  | : |                        |
|               Defendants.        | : |                        |

## <u>ORDER</u>

This ERISA[1] action comes before the Court on Defendant Sears,

Roebuck & Company's Motion for Summary Judgment [30], Plaintiff's Motion

for Summary Judgment [31], Defendants Metropolitan Insurance Company and

Sears Group Long Term Disability Plan's Motion for Summary Judgment [32],

---

[1] Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §
1001, <u>et seq.</u>.

and Defendants' Motion to Strike Exhibits 11, 12, and 13 Submitted in Support of Plaintiff's Motion for Summary Judgment [37].  As a preliminary matter, Defendants' Motion to Strike Exhibits 11, 12, and 13 Submitted in Support of Plaintiff's Motion for Summary Judgment [37], being unopposed and predicated on a correct statement of the law, is **GRANTED**.  With respect to the parties' motions for summary judgment, the Court, having reviewed the record, now enters the following Order.

## Background

### I.      Plaintiff's Employment with Sears and the Company's Long Term Disability Benefits Plan

Plaintiff is a former employee of Sears, Roebuck & Company ("Sears"), where she once held the position of Human Resources Administrator.  The "[p]rimary responsibilities" of that job, according to a Sears Position Description, "include[d] electronic processing of timekeeping, adjustments to pay, and electronic processing of all new hires and terminations."  (See ML 220.)[2]  Plaintiff asserts that her job duties also required data entry, verbal

---

[2] Much of the record in this case consists of Bates labeled records authenticated by records custodians from Sears and MetLife.  For ease of reference, and in keeping with the parties' practice in this litigation, the Court cites the Bates labeled page in the record where such a page number is available.

2

communication, and the ability to prioritize and resolve problems.

As an eligible full time employee of Sears, Plaintiff was a participant in the Sears Group Long-Term Disability Plan (the "Plan").  Sears was identified by the Plan as the Plan Administrator and Sponsor.

At all times pertinent to this action, benefits under the Plan were funded by a policy issued by Defendant Metropolitan Life Insurance Company ("MetLife").  Under the terms of the Plan, the insurance company was vested with "claims administration and fiduciary responsibility[,]" and, as "the entity to which the Plan Administrator ha[d] delegated such responsibility[,]" had the "sole discretionary authority to determine eligibility for benefits under the [Plan], to determine the amount and form of benefits payable under the [Plan], to construe the terms of the [Plan], and to make factual determinations about all [Plan] matters."  (See ML 620-21, 639.)  Following this delegation, Sears was uninvolved in the process of evaluating participants' entitlement to benefits under the Plan, and did not pay the benefits to which participants became entitled.[3]

_____

[3] Plaintiff purports to "dispute" this fact in her Response to Sears's Statement of Undisputed Material Facts, but does so only by referring to Sears's "management decision" to delegate discretionary authority under the Plan to MetLife, and the

The Summary Plan Description ("SPD"), insofar as it addressed participants' eligibility to receive long-term disability benefits, provided that, "If you are Disabled due to the same or related Illness or Injury for 140 days within any 180 consecutive-day period (the 'Waiting Period'), you may be entitled to benefits from the LTD Plan." (See ML 537.) The SPD went on to enumerate five conditions for eligibility, including, *inter alia*, that the participant "remain Disabled throughout the Waiting Period" and "continue to be Disabled after completing the Waiting Period[.]" (Id.) Benefits would not be paid under the Plan, the SPD stated, if a participant failed to "submit satisfactory proof of [her] Disability to the insurance company . . . [or her] Disability beg[an] after [her] coverage ha[d] been terminated or suspended." (Id.)

The SPD defined "Disability," as applied to participants in Plaintiff's job classification, as follows: "During the Waiting Period and thereafter, you are Incapable of Performing the material duties of any gainful occupation for which you are reasonably qualified based on your training, education, and

_____

company's "maintenance" of the Summary Plan Description. (See Pl.'s Resp. to Statement of Undisputed Facts [41] at ¶ 6.)

4

experience." (Id.) "Incapable of Performing," it continued, "means that during the Waiting Period and the next 24 consecutive months you are unable to earn more than 80% of your Monthly LTD Covered Earnings [defined as your Payroll Year earnings in effect on the day before your Disability began, rounded to next higher thousand, and divided by 12] . . . [and that a]fter the first 24 months, . . . you are unable to earn more than 60% of your Monthly LTD Covered Earnings . . . ." (See ML 544.)

The SPD went on to address the "Medical Evidence" necessary to obtain benefits, stating:

> To qualify for benefits under the Plan, Disability must be supported by current medical documentation. You must be under the regular care of a qualified Physician under a course of treatment appropriate for the Disability . . . .
>
> If you cannot or will not provide conclusive medical evidence of Disability, LTD benefits will be denied or discontinued.
>
> Continuation of LTD benefit payments will require ongoing certification of disability based on updated medical documentation. The insurance company will determine how often you will need to provide updated medical documentation.

(See ML 537.)

5

## II.    Plaintiff's Claim and MetLife's Denial of Benefits

Plaintiff claims to have developed a disability on March 19, 2001,

attributable to a fall she suffered in her home in February of the same year.  She

submitted a Disability Claim on July 25, 2001, in which she complained of:

> Pain to knee when sitting with knee bent.  Arthritis.
> Chronic pain and swelling to right knee and right
> ankle with weakness when walking and standing.
> Side effects from pain medication.  The pain affects
> my ability to maintain focus and concentrate.

(See ML 179.)  MetLife initially determined that Plaintiff was entitled to

disability benefits, and remitted such benefits for the period beginning July 25,

2001, and ending September 30, 2001.  In the same letter in which it approved

the payment of such benefits, dated September 19, 2001, MetLife requested

additional documentation from Plaintiff, informing her that if it did not receive

"the . . . requested information on or by October 18, 2001, [her] claim [would]

be closed and further benefits denied[.]"  (See ML 167.)  The parties dispute

whether such information was provided by Plaintiff within the relevant time

frame.  In any event, MetLife sent Plaintiff a letter suspending her benefits on

October 31, 2001, "pending [its] receipt and review of additional medical

information."  (See ML 157.)  Although Plaintiff submitted some further

documentation over the next several months, MetLife, in early December 2001, reached the conclusion that Plaintiff "should be able to resume a sedentary capacity which [is what] her position appears to be." (See ML 54.)  Plaintiff was informed of this determination, and submitted yet further information she contended supported the existence of her disability.

The record indicates that, over the next month, MetLife followed up with Plaintiff's health care providers and considered the additional information submitted in support of her claim. (See ML 54-59.)  Ultimately, however, it concluded that the newly acquired data did "not appear to provide any new or further evidence that supports [Plaintiff's claim] or would preclude a [return to work] in a sedentary capacity." (See ML 58-59.)  By letter dated January 18, 2002, MetLife stated that it had reviewed Plaintiff's file, had submitted it to both an "Independent Physician Consultant" and its Vocational Department, and, after considering the matter, had decided to deny her claim. (See ML 97-98.)  It stated, "While your medical records are consistent with ongoing knee pain and while your standing and walking should be limited, we found no medical evidence or documentation that would preclude you from returning to your sedentary occupation." (See ML 98.)

7

Plaintiff promptly appealed this decision, submitting still further documentation she contended supported the existence of a disability.  (See ML 81-82.)  MetLife indicated that it would review the appeal (see ML 95), and submitted the file to Mark Moyer, M.D., an "Independent Physician Consultant Board Certified Physician," for his review.  After receiving and reviewing Dr. Moyer's report,  in which he identified relatively few records not previously submitted to MetLife, the insurance company denied Plaintiff's appeal, explaining,

> [N]either the medical information in file nor the additional information provided for review supported significant impairments, limitations, or deficits that would preclude a return to your previous sedentary job.  We therefore conclude that the original decision to deny benefits was correct.

(See ML 76.)  In the same letter, dated March 5, 2002, MetLife also explained that it was not persuaded to alter its determination in light of newly submitted evidence respecting Plaintiff's mental health, which Plaintiff contended demonstrated that she was suffering from disabling depression.  Relying on a provision of the Plan that limited disability benefits predicated on "mental and nervous disorders" to twelve months, absent hospitalization, it stated, "Since

8

you have already been paid more than 12 months of benefits, we would not consider a Mental/Nervous diagnosis unless you were confined in [a] hospital for a psychiatric condition."  (<u>See</u> ML 73-74.)  The parties agree that this conclusion was factually erroneous, because Plaintiff had, in fact, received benefits under the Plan for only two months.

## III.    The Administrative Record

The administrative record in this case, upon which MetLife purports to have relied in denying Plaintiff's claim, is voluminous.  Because its contents are crucial to the resolution of this action, however, the Court takes this opportunity to set forth pertinent provisions of the record in some detail.  For purposes of clarity, it groups the records and opinions that constitute the administrative record by the health professional who authored them.[4]

### A.    Dr. Letha Griffin, Orthopedic Surgeon

Shortly after the onset of her alleged disability, Plaintiff received treatment from Dr. Letha Griffin, an orthopedic surgeon.  At the time of Plaintiff's initial visit with Dr. Griffin, the doctor concluded that, "due to [an]

---

[4] The record also reflects that Plaintiff herself made contact with MetLife on a number of occasions, complaining of symptoms similar to that found in the administrative record.

ankle fracture [Plaintiff] should remain out of work until she feels more stable[,]" and referred Plaintiff to physical therapy.  (See Pl.'s Initial Disclosures [21], Appendix A, at 91, 111 [hereinafter, "Pl.'s App."].)  In a subsequent Attending Physician's Statement ("APS") submitted to MetLife, however, Dr. Griffin indicated that Plaintiff had "recovered," was "able to work," and that she was able[5] to perform "all duties [of her job as of April 23, 2001] in regards to [her] ankle."  (See ML 169.)

### B.    Dr. Thomas P. Branch, Orthopedic Surgeon

Plaintiff's physical therapist referred her to Thomas P. Branch, MD, for treatment of her knee condition in mid-2001.  Dr. Branch diagnosed Plaintiff with having an osteochondral lesion on her medial femoral condyle (the rounded portion of her bone forming a joint at the knee), and performed surgery on Plaintiff, treating her, all told, for approximately five months.  (See ML 104.)  Dr. Branch indicated, *vis-a-vis* Plaintiff's psychological function, that she was a "Class 1 – Patient is able to function under stress and engage in

---

[5] Dr. Griffin wrote on the form, "all duties at 4/23/01 in regards to ankle," after being prompted to answer the question, "What duties of patient's job is he/she *incapable* of performing?"  (See ML 169) (emphasis supplied).  Nevertheless, the parties seem to agree, and the form, read in its entirety, certainly makes clear that she was responding that Plaintiff was *capable* of performing "all duties" as of the referenced date.

interpersonal relations (no limitations)."  (Id.)  He additionally indicated that, at least as of early October 2001, she was capable of sitting for eight hours; standing and walking for four hours, intermittently; reaching above her shoulder level; operating a motor vehicle; lifting up to ten pounds occasionally; and performing fine finger movements, eye/hand movements, and pushing and pulling.  (See ML 105.)

Over the months during which he treated Plaintiff, Dr. Branch revised his conclusions respecting Plaintiff's ability to return to work several times.  His evolving assessments are set forth in the table that follows:

| Assessment Date | Conclusion |
|---|---|
| May 16, 2001 | On an APS, Dr. Branch responded in the negative to question, "Would patient be able to perform a light duty job?"  (See Pl.'s App. at 93.) |
| June 21, 2001 | In a "return to work" form, Dr. Branch indicated that it was his "opinion that [Plaintiff] should remain in [physical therapy] and not work for 3 more weeks."  (See id. at 94.) |
| July 23, 2001 | On an APS, Dr. Branch indicated that he had not advised Plaintiff to "cease" her occupations as a Human Resource Administrator, and that he had "advised [Plaintiff] to return to work" on a "full-time" basis on August 21, 2001.  (Id. at 95-97.) |
| August 24, 2001 | On a "return to work" form, Dr. Branch indicated that "[Plaintiff] will be unable to work until she returns to my office on 9/12.  At that time we will re-evaluate her ability to return to work."  (Id. at 98.) |
| October 5, 2001 | On an APS, Dr. Branch indicated that he had not advised Plaintiff to return to work, explaining that she was "still having pain w/ walking & stairs."  (Id. at 100-01; ML 104-05.) |

11

| October 22, 2001 | On a "return to work" form, Dr. Branch indicated that "[Plaintiff] is still unable to work & will be out of work until approximately 1/1/2002. [A]t that time we hope to return to regular work status." (See Pl.'s App. at 102.) |
|---|---|
| October 31, 2001 | On a "return to work" form, Dr. Branch indicated that, while Plaintiff was "continually improving," she was "still recovering from her surgery" and was "still unable to work." He indicated that she could "hopefully" return to work by January 1, 2002. (Id. at 103.) |

### C.    Dr. S. Kahn, Primary Care Physician

Plaintiff has additionally submitted records generated by Dr. S. Kahn, her primary care physician during times relevant to this lawsuit. It appears that in mid-2001, Dr. Kahn treated Plaintiff for vertigo, hypertension, allergies, dizziness, and diarrhea stemming from certain medications she was taking. (See Pl.'s App. at 128-29.) Moreover, beginning in early November 2001, he responded to her complaints of depression, stress, and insomnia by prescribing Prozac and referring her to a psychiatrist. (Id. at 129-30.) By early 2002, he recommended that she stay out of work for at least ten days due to "severe depression." (Id.)

### D.    Dr. Vincent E. Boswell, Orthopedic Surgeon

While still under the care of Dr. Branch, Plaintiff sought out the treatment of Dr. Boswell, also an orthopedic surgeon, for the pain associated

12

with her knee.  On September 21, 2001, shortly after MetLife requested

additional documentation from Plaintiff respecting her purported disability, Dr.

Boswell completed a "Certification of Medial Care" form stating that Plaintiff

was "partially incapacitated" and that, "secondary to knee pain [she would be]

unable to work for the next 60 days."  (Id. at 99.)  He provided no further

explanation on that form, but, in notes related to a September 7, 2001 office

visit, had indicated that Plaintiff had complained that her knee pain had not

improved while receiving treatment from Dr. Branch, and that she demonstrated

"an abnormal gait and . . . difficulty walking."  (Id. at 134.)  Dr. Boswell's notes

additionally reflect his understanding that Plaintiff's position with Sears

"require[d] a fair amount of walking[.]"  (Id.)

　　　By mid-October, however, Dr. Boswell's notes indicate that Plaintiff,

while still complaining of knee pain, was, objectively speaking, "walking

without a limp" and that "[t]here was no edema or swelling of the feet or

ankle."  (See ML 120-21.)  He also stated that "given [his] evaluation of [her]

knee it is uncertain why [Plaintiff] is having pain[,]" but noted that his

examination revealed "mild" to "some tenderness."  (Id.)

13

### E.    Dr. Rajiv D. Pandya, Orthopedic Surgeon

Dr. Boswell referred Plaintiff to Dr. Rajiv D. Pandya, also an orthopedic surgeon, in light of Plaintiff's expressed interest in further surgical treatment. During his initial consultation with Plaintiff, Dr. Pandya completed a form (seemingly generated by his practice), and, in addition to indicating that Plaintiff should attend physical therapy for the next eight weeks, checked a box on the form providing, "Employee may NOT return to work."  (See Pl.'s App. at 104.)  He provided no further explanation on that form, and did not fill in the blank reading, "Estimated date of return to work."  (Id.)  In terms of his overall plan for diagnosis and treatment, Dr. Pandya stated that, while Plaintiff was complaining of knee pain, her "surgery [was] only 6 mos. ago – should give it at least 9-12 mos. before concern."  (Id. at 105.)

Thereafter, on December 4, 2001, Dr. Pandya, apparently without having seen Plaintiff in the interim, completed the same form and wrote, "sedentary work ONLY!"  (Id. at 106.)  This time, he checked the box indicating, "Employee may return to work with restrictions," and indicated that she should avoid repetitive squatting, kneeling, bending, and twisting, as well as prolonged standing and walking.  (Id.)  Plaintiff, when she learned of this assessment,

14

contacted MetLife and said that Dr. Pandya had made a mistake, because, she stated, he thought the form was to be submitted in connection with a workers' compensation claim.  (See ML 55.)

MetLife and Dr. Pandya's office thereafter attempted to communicate with one another about Plaintiff's condition, but it appears these efforts were unavailing, with no direct dialogue between the physician and the insurance company.  Later in the month of December 2001, moreover, Dr. Pandya, in Plaintiff's words, "relinquished any opinions" about her level of disability, stating that he had referred her to a pain management specialist and that the specialist would be "responsible for adjusting her level of disability due to her pain."  (See Pl.'s App. at 145.)

### F.    Dr. Eric D. Solomon, Pain Specialist

Eric D. Solomon, DO, a pain specialist, began treating Plaintiff in early 2002.  He stated that the surgery Plaintiff underwent in May of 2001 "actually aggravated her symptoms," and that she reported an inability to "walk very well . . . [or] return to work."  (See ML 86.)  He diagnosed Plaintiff with degenerative joint disease, knee pain, and as experiencing "abnormal biomechanics with pronated feet."  (See ML 87.)  Dr. Solomon also indicated,

however, that Plaintiff did not appear to be in "distress," "[d]enie[d] insomnia, weakness, lethargy, . . . [or] dizziness[,]" and described her mental health by stating, "Oriented to time place and person, recent and remote memory are intact."  (See ML 86-87.)

In a follow-up visit in late-January 2002, Dr. Solomon reported that Plaintiff complained of feeling "very depressed [and] anxious[,]" and was being treated by a psychiatrist, Dr. William C. Carter.  (See ML 88.)  At the bottom of a "Followup Evaluation" form, moreover, he indicated that "She is unable to work at the current time but will be cleared through Dr. Carter's office when appropriate."  (Id.)

### G.     Dr. William E. Carter, Psychiatrist

As related above, when MetLife denied Plaintiff's claim in January of 2002, she appealed its decision.  In connection with that appeal, she produced, for the first time, an APS prepared by Dr. Carter, her recently retained psychiatrist.  Dr. Carter indicated on the form that Plaintiff suffered from "Major Depression secondary to medical condition[,]" and rated her Psychological Function as "Class 4 – unable to engage in stress situations or engage in interpersonal relations (marked limitations)."  (See ML 83.)  He

16

stated that he had advised Plaintiff not to return to work "until [her] symptoms are improved[,]" and "recommended she not return to work until I state she is fit for duty." (Id.; see also Pl.'s Mot. for Summ. J. [31] at Ex. 9.)

## H.    Records Associated with Physical Therapy

In addition to the records generated by her physicians, Plaintiff has also submitted records demonstrating her rather frequent visits to physical therapists. These records indicate, *inter alia*, that Plaintiff experienced some pain and swelling in her knee, and exhibited a decreased range of motion, strength, and function. (See Pl.'s App. at 147, 151.)

## I.    Review by Dr. Kevin Smith and Dr. Mark Moyer, Independent Physician Consultants

In addition to the records and information reflected above, MetLife's files also contain evaluations prepared by two "Independent Physician Consultants," Dr. Kevin Smith and Dr. Mark Moyer. These gentlemen reviewed Plaintiff's medical records and examined her vocational information. The record also shows that Dr. Smith attempted, with little success, to contact Dr. Pandya regarding the latter's varied assessments of Plaintiff's condition.

17

Dr. Smith ultimately concluded, in a Physician Consultant Review dated November 27, 2001, that "[a]lthough medical records show objective findings on examination and associated right knee tenderness, this should not preclude [Plaintiff] from returning to her job on a full time basis." (See ML 109-112.) He added that he concurred with the APS prepared by Dr. Branch that found Plaintiff "could sit up to eight hours a day and stand and walk up to one hour each[,]" continuing, "This would appear to fall within her job description as a Human Resource Manager although the functional components of the job were not delineated in the records." (See ML 111.)

Dr. Moyer authored his opinion after Plaintiff's claim had been denied, and she was pursuing her appeal. He found the only new information respecting Plaintiff's knee injury submitted on appeal were an office note from Dr. Pandya and records from Plaintiff's early January 2002 visits with Dr. Solomon. (See ML 79-80.) After reviewing this newly submitted information, Dr. Moyer concluded that:

> The additional medical information provided would not support that significant impairments, limitations or deficits exist that would preclude a return to this person's previous job. Her job is described as being sedentary, however, she has informed her physician

that it was actually "quite rigorous".  It is possible that
Ms. Tookes has over estimated the physical
requirements of her sedentary position; on the other
hand there may be actual requirements not stated to
date.  If this person, in fact, has a sedentary job as it is
recorded, and her walking [and] standing
requirements are minimal, then the information
provided would support her continued ability to return
to that position . . . .

In summary, the additional information does not
provide evidence of additional impairments,
limitations or deficits that would preclude a return to
sedentary level work.

(See ML 80.)

## IV.  Procedural History

Plaintiff brought suit against MetLife, Sears, and the Plan in July of

2004, asserting claims for:

Count I.       Recovery of Plan Benefits, 29 U.S.C. § 1132(a)(1)(B),

ERISA § 502(a)(1)(B);

Count II.      Breach of Fiduciary Duty, 29 U.S.C. § 1132(a), ERISA §

502(a)(3);

Count III.     Interference with Protected Rights, 29 U.S.C. § 1140,

ERISA § 510; and

19

Count IV.     Attorneys Fees, 29 U.S.C. § 1132(g).

(See Compl. [1].)  The Court, by Order dated January 27, 2005, dismissed Count III of the Complaint *vis-a-vis* MetLife because MetLife was not Plaintiff's employer, and thus, not subject to liability under § 510.  (See Jan. 27, 2005 Order [17].)  It additionally dismissed Count II against all Defendants, holding that Plaintiff was not permitted to proceed under § 503(a)(3) because the allegations made in support of that claim were amenable to redress under § 502(a)(1)(B).  (See id.)

All parties have now moved for summary judgment.  The Court now turns to resolve, through application of authority and the procedural framework established by Rule 56, (i) whether Sears is liable to Plaintiff under either § 502(a)(1)(B) or § 510, and (ii) whether MetLife is liable to Plaintiff under § 502(a)(1)(B).

## Discussion

## I.     Procedural Standard

Federal Rule of Civil Procedure 56 requires that summary judgment be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). "The moving party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.' " Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259 (11th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (internal quotations omitted)). Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The applicable substantive law identifies which facts are material. Id. at 248. A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law. Id. An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 249-50.

21

In resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party.  Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th Cir. 2002).  But, the court is bound only to draw those inferences which are reasonable.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50 (internal citations omitted); see also Matsushita, 475 U.S. at 586 (once the moving party has met its burden under Rule 56(c), the nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts.").

Finally, the filing of cross-motions for summary judgment does not give rise to any presumption that no genuine issues of material fact exist.  Rather, "[c]ross-motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is

entitled to judgment as a matter of law."  Shaw Constructors v. ICF Kaiser

Eng'rs, Inc., 395 F.3d 533, 538-39 (5th Cir. 2004).

## II.    Sears's Liability to Plaintiff

### A.    ERISA § 502(a)(1)(B)

ERISA provides participants and beneficiaries with standing to bring

civil actions for the recovery of benefits "due . . . under the terms of [the] plan,

to enforce . . . rights under the terms of the plan, or to clarify . . .  rights to

future benefits under the terms of the plan. . . ." 29 U.S.C. § 1132(a)(1)(B).  "In

ERISA, Congress took a functional approach towards defining who would be

treated as a fiduciary."  Hunter v. Met. Life Ins. Co., 251 F. Supp. 2d 107, 112

(D.D.C. 2003).

> Under the statute "a person is a fiduciary . . . to the
> extent . . . he exercises any discretionary authority or
> discretionary control respecting management of such
> plan or exercises any authority or control respecting
> management or disposition of its assets, . . . renders
> investment advice for a fee or other compensation,
> direct or indirect, with respect to any moneys or other
> property of such plan, or has any authority or
> responsibility to do so, or . . . has any discretionary
> authority or discretionary responsibility in the
> administration of such plan." 29 U.S.C. §
> 1002(21)(A).  A benefit plan may provide for a named
> fiduciary such as a plan administrator or plan sponsor

23

> "to designate persons other than named fiduciary to carry out fiduciary responsibilities . . . under the plan." 29 U.S.C. § 1105(c)(1).  If a "person is designated to carry out any such responsibility, then such named fiduciary shall not be liable for an act or omission of such person in carrying out such responsibility" except in certain limited circumstances that are inapplicable here.  29 U.S.C. § 1105(c)(2).

Id. at 113.

In this case, Plaintiff concedes that Sears delegated all responsibility for both the determination of whether a claimant is entitled to benefits under the Plan, and for payment of any benefits under the Plan, to MetLife.  (Pl.'s Br. in Opp'n to Mot. for Summ. J. at 2 ("Sears delegated to MetLife the responsibility for reviewing and making all determinations on LTD claims."); id. at 3 ("[B]oth parties agree that *Sears delegated* payment and claims responsibilities to MetLife.") (emphasis in original).)  Sears has delegated all discretionary authority for claims determinations under the Plan to MetLife.  Moreover, the record is entirely devoid of evidence which would indicate that Sears retained or exercised any discretionary authority or control over the disposition of Plaintiff's benefit claims under the Plan.  As such, Plaintiff's claims against Sears under the Plan are foreclosed as a matter of law.  Compare, e.g., Garren v.

24

<u>John Hancock Mut. Life Ins. Co.</u>, 114 F.3d 186, 187 (11th Cir. 1997) (holding employer to be proper defendant on ERISA claim where it acted as plan administrator, retained complete discretionary authority over the plan, and insurance company exercised no discretion, responsibility or control over the administration of the plan); <u>Rosen v. TRW, Inc.</u>, 979 F.2d 191, 193 (11th Cir. 1992) (concluding that employer who took active part in the administration of the plan was proper defendant under ERISA), <u>with</u> <u>Hunter</u>, 251 F. Supp. 2d at 113 (dismissing ERISA claims against employer where it delegated all authority for claim determination and payment to insurance company, and thus, did not function as a fiduciary for purposes of those claims, and no evidence indicated that employer played any role in determination of plaintiff's claims); <u>Henderson v. Transamerica Occidental Life Ins. Co.</u>, 120 F. Supp. 2d 1278, 1281 (M.D. Ala. 2000) (dismissing employer in ERISA action where, although employer established and sponsored the plan and was identified as "plan administrator," employer delegated authority for claim determination to insurance company and exercised no control over determination of claims).

Plaintiff raises two additional arguments which need not detain the Court long.  First, insofar as Plaintiff contends that Sears remains liable as a Plan

25

fiduciary because Sears made the decision to delegate authority for claims administration to MetLife, that contention is without merit. Section 1105(c)(1) expressly contemplates such delegation and § 1105(c)(2) expressly provides that, as a general rule, no fiduciary liability attaches to the delegator for acts or omissions of the delegatee in carrying out their duly delegated duties. As Plaintiff has failed to point to any evidence that an exception to this general rule applies, Sears is entitled to judgment as a matter of law on this theory. 29 U.S.C. § 1105(c)(2); <u>Hunter</u>, 251 F. Supp. 2d at 113.

Second, Plaintiff contends that Sears is responsible for her claims under the Plan because Sears reserved the right to change the insurance company designated as the claims administrator under the Plan. This argument is nonsensical. An employer's reservation of the right to delegate authority for administration of the plan to a different entity at some future point in no way vitiates the effect of the present delegation of authority to determine Plaintiff's claims. <u>See</u> <u>Henderson</u>, 120 F. Supp. 2d at 1281 (finding employer to be improper defendant despite exercising broad authority over the ERISA plans in general, including authority to select insurer, where employer exercised no discretion over determination of plaintiff's benefit claims). As such, Sears

26

cannot be held liable for the exercise of MetLife's duly delegated authority under the Plan and bears no responsibility for Plaintiff's claims under the Plan.

Finally, even assuming that Sears were found to be a proper defendant with respect to Plaintiff's claims under the Plan, for the reasons set forth below in the discussion of Plaintiff's claims against MetLife, those claims fail as a matter of law.

### B.    ERISA § 510

Plaintiff asserts a claim against Defendant Sears for wrongful interference with Plaintiff's protected rights pursuant to ERISA § 510.  (See Compl. ¶¶ 45-46.)  Specifically, Plaintiff alleges that "By wrongfully, self-servingly, intentionally, arbitrarily and capriciously terminating and denying Tookes' LTD [Plan] Claim, Defendants interfered with Tookes' past, present and future rights and interests to other employee benefits dependant upon the eligibility of her LTD Claim under the Plan."  (Compl. ¶ 46.)  Sears contends that this claim fails as a matter of law.

ERISA § 510 makes it unlawful "to discharge . . . a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan . . . or for the purpose of interfering with the

27

attainment of any right to which such participant may become entitled."  29

U.S.C. § 1140.  "Congress enacted section 510 primarily to prevent

'unscrupulous employers from discharging or harassing their employees in

order to keep them from obtaining vested pension benefits.' " Dewitt v. Penn-

Del Directory Corp., 106 F.3d 514, 522 (3d Cir. 1997) (quoting Haberern v.

Kaupp Vascular Surgeons Ltd., 24 F.3d 1491, 1501 (3d Cir. 1994)).  "The

statutory language, legislative history and case law all make clear that § 510

was designed to protect the 'employment relationship,' not the integrity of

specific plans." Owens v. Storehouse, Inc., 773 F. Supp. 416, 418 (N.D. Ga.

1991), aff'd, 984 F.2d 394 (11th Cir. 1993).  "Thus, 'a fundamental prerequisite

to a § 510 action is an allegation that the employer/employee relationship, and

not merely the plan, was changed in some discriminatory or wrongful way.' "

Id. (quoting Deeming v. Am. Standard, Inc., 905 F.2d 1124, 1127 (7th Cir.

1990)).

Plaintiff's Complaint simply does not challenge Sears's decision to

terminate her employment.  Rather, Plaintiff merely complains that the decision

to terminate her benefits under the Plan, which was made by MetLife, interfered

with her right to obtain other employee benefits dependent upon her continued

28

receipt of benefits under that Plan.  As such, Plaintiff's claim against Sears

under § 510 fails as a matter of law.[6]

## III.    MetLife's Liability to Plaintiff

Plaintiff's claims that MetLife violated § 502(a)(1)(B) of ERISA by

denying her benefits to which she is entitled under the Plan.  For the reasons

that follow, the Court concludes that MetLife is entitled to summary judgment

on this claim.

### A.    Analytical Framework

ERISA itself is silent regarding the standard of review applicable to an

administrator's benefits determination.  The Eleventh Circuit, however, has

---

[6] Plaintiff's brief in response to Sears's motion for summary judgment raises two issues which bear noting.  First, insofar as Plaintiff argues in her responsive brief that Count III asserts claims for interference with protected rights based on the termination of her employment, that allegation simply does not appear on the face of Plaintiff's Complaint. "[P]laintiff may not amend her complaint through argument in a brief opposing summary judgment," Gilmour v. Gates, McDonald and Co., 382 F.3d 1312, 1315 (11th Cir. 2004), and as such, the Court declines to consider these arguments.

Second, insofar as Plaintiff argues that Count I of her Complaint asserts claims for anything more than claims for recovery of benefits under the LTD Plan, the Court disagrees.  Upon reading Count I of Plaintiff's Complaint, the Court is left with the unavoidable conclusion that she challenges only the denial of benefits under the LTD Plan, and nothing more.  As such, the Court declines to read Count I as challenging the denial of benefits under any other plan.

articulated three levels of scrutiny that may apply when such a determination is challenged:

> (1) *de novo* where the plan does not grant the administrator discretion; (2) arbitrary and capricious when the plan grants the administrator discretion; and (3) heightened arbitrary and capricious where there is a conflict of interest.

See Buckley v. Metro. Life, 115 F.3d 936, 939 (11th Cir. 1997).

In the present case, the parties agree that MetLife, at the time it terminated Plaintiff's benefits, was both vested with discretion under the plan and suffered from a conflict-of-interest.  Consequently, MetLife's challenged benefits determination is subject to this last, "heightened" arbitrary and capricious level of review.  Brown v. Blue Cross & Blue Shield of Ala., Inc., 898 F.2d 1556, 1566-67 (11th Cir. 1990).  Application of this standard involves a tripartite inquiry.[7]

First, from a *de novo* perspective, the Court must ascertain whether the decision to deny benefits was "wrong"–that is, whether the Court disagrees with

---

[7] The standard to be applied by the court has been variously stated.  Nevertheless, "[w]here, as here, the parties agree that the administrator both possessed discretion in denying benefits and suffered from a conflict of interest, an abbreviated three-step analysis is appropriate."  See Shahpazian v. Reliance Standard Life Ins. Co., 388 F. Supp. 2d 1368, 1373 n.7 (N.D. Ga. 2005).

30

it.  Williams v. BellSouth Telecomms., Inc., 373 F.3d 1132, 1138 (11th Cir. 2004).   If it is not "wrong," then the defendant prevails.  Id.

In the event that the Court disagrees with the defendant's decision, however, it next looks to whether the challenged decision was "reasonable."  Id. A decision is "reasonable" when "there was a reasonable basis for the decision, based upon the facts as known to the administrator at the time the decision was made."  See Jett v. Blue Cross & Blue Shield of Ala., Inc., 890 F.2d 1137, 1139 (11th Cir. 1989).  Should the defendant's decision prove both wrong and not reasonable, then the claimant is entitled to prevail.  Williams, 373 F.3d at 1138.

A third and more difficult question arises where the defendant's decision to deny benefits is wrong but, nevertheless, reasonable.  Were the decision subjected only to "ordinary" arbitrary and capricious review–*i.e.*, that applied in circumstances where a defendant is vested with discretion to interpret the plan but does *not* suffer from a conflict-of-interest–it would be entitled to deference, and the defendant would not be held liable.  Id.  Under the heightened arbitrary and capricious standard, however, more is required before the defendant may avoid liability.  Id.

31

This Court recently addressed its understanding of what such a showing

entails in Wise v. Hartford Life & Accident Ins. Co., 360 F. Supp. 2d 1310

(N.D. Ga. 2005).  There, the Court stated:

> [A] conflicted plan administrator may carry its burden
> in a suit challenging a "wrong but reasonable" factual
> determination if it can demonstrate that the opinions
> and evidence it relied on denying the plaintiff's claim
> were, viewed both from a qualitative and quantitative
> perspective, at least as objectively reliable as the
> countervailing opinions and evidence then before it.
> By demonstrating that it chose to follow what it
> reasonably perceived as equally or more objectively
> reliable data, the insurer substantially ameliorates any
> fears that its decision was motivated by self-interest
> rather than by a good faith effort to exercise its
> discretion to interpret and apply the plan.  Should the
> administrator meet this burden, the plaintiff can then
> prevail only if he demonstrates that the decision was
> arbitrary and capricious by "other measures."

Wise, 360 F. Supp. 2d at 1323.  It acknowledged, moreover, that there may be

circumstances in which an ERISA defendant could obtain summary judgment at

this stage of the inquiry, even were it not able to demonstrate its decision was

not "wrong" as a matter of law.  Id. at 1323-24; cf. also Barchus v. Hartford

Life & Accident Ins. Co., 320 F. Supp. 2d 1266, 1290 (M.D. Fla. 2004)

(granting summary judgment to administrator under heightened arbitrary and

capricious review, notwithstanding assumption that the administrator's decision was "wrong" and conclusion that the decision was "reasonable").  That is, while conflicting medical opinions would preclude summary judgment on the basis that the challenged decision was "correct," an ERISA defendant might still be able to show, as a matter of law, that the predicates for its decision to deny benefits were equally as reliable, from an objective perspective, as those which supported the participant's claim.

With these principles as a foundation, the Court turns to address the viability of Plaintiff's claims against MetLife here.

### B.    MetLife is Entitled to Summary Judgment

1.    The Initial Inquiries in the "Heightened" Arbitrary and Capricious Review

The first two stages of the foregoing standard are not difficult to apply in this case.  First, the Court cannot say, as a matter of law, that MetLife's decision was not "wrong" from the perspective of a *de novo* review.  Conflicting evidence in the administrative record[8] respecting her capacity to

---

[8] Even in conducting this *de novo* step in the "heightened" arbitrary and capricious analysis, the Court limits itself to the administrative record.  See Parness v. Metro. Life Ins. Co., 291 F. Supp. 2d 1347, 1356-57 (S.D. Fla. 2003) ("Parness appears to be equating the *de novo* review applied by a court when the plan administrator is not vested

return to work, which existed both at the time MetLife denied her benefits and affirmed its decision on appeal, creates a genuine issue in this regard.  See, e.g., Shaw v. Conn. Gen. Life. Ins. Co., 353 F.3d 1276, 1286-87 (11th Cir. 2003) (in case requiring *de novo* analysis respecting whether insurer's decision was "wrong," held that conflicting opinions of various medical providers precluded summary judgment on ERISA claim); Wise, 360 F. Supp. 2d at 1320-21 (holding likewise).

Conversely, as it relates to the second stage in the analysis, the Court concludes that MetLife has come forward with more than ample evidence demonstrating that there existed *some* "reasonable basis for [its] decision, based upon the facts as known to [it] at the time the decision was made."  See Jett, 890 F.2d at 1139.  The record is ripe with opinions of medical professionals indicating that, while Plaintiff may have injured her knee and ankle in early 2001, those injuries were not so severe as to preclude her, at the time MetLife

---

with discretionary authority, under which the Court may consider evidence outside the administrative record, and the *de novo* review applied to the legal interpretation of disputed terms in the plan documents during the first step of the heightened arbitrary and capricious standard of review.  The Court does not think they are the same.").

34

denied her benefits (effective October 2001) and thereafter, from performing the functions of her sedentary occupation.  Such evidence included:

a.      The opinion of Dr. Griffin, an orthopedic surgeon, that Plaintiff, as of April 23, 2001, had "recovered," was "able to work," and that she was able to perform "all duties [of her job] in regards to [her] ankle";[9]

b.      The observations of Dr. Branch, also an orthopedic surgeon, that, as of October 5, 2001, Plaintiff was capable of sitting for eight hours; standing and walking for four hours, intermittently; reaching above her shoulder level; operating a motor vehicle; lifting up to ten pounds occasionally; and performing fine finger movements, eye/hand movements, and pushing and pulling;[10]

---

[9] Plaintiff urges that Dr. Giffin's opinion was limited to her condition *vis-a-vis* her ankle, and, anomalously, did not take into account her knee injury.  What this argument ignores is that Dr. Griffin's earlier assessment that Plaintiff was *unable* to return to work rested solely on the existence of an ankle fracture.  This latter statement is thus highly probative, in that it illustrates Dr. Giffin's conclusion that the sole condition she initially found precluded Plaintiff from working no longer so precluded her as of April 2001.

[10] Although Dr. Branch did not advise Plaintiff to return to work, his assessment reflects that this opinion was predicated solely on the fact that Plaintiff was "still having pain w[ith] walking and stairs."  (See ML 105.)  Thus, Dr. Branch's opinion that Plaintiff should not return to work in no way refutes MetLife's conclusion that Plaintiff was capable of performing the largely, if not entirely, sedentary duties associated with her

AO 72A
(Rev.8/82)

c.      The notes of Dr. Boswell, an orthopedic surgeon, reflecting that, notwithstanding his September 2001 assessment that Plaintiff should remain out of work for sixty days, as of October 2001 she was "walking without a limp," that there was "no edema or swelling of the feet or ankle[,]" and that he was "uncertain" why Plaintiff was continuing to experience pain;

d.      Dr. Pandya's revised conclusion, in early December 2001, that Plaintiff was capable of performing sedentary work;

e.      The records of Dr. Solomon, a pain specialist, which suggested that Plaintiff's inability to work, as of January 2002, related only to her mental health issues, as he left the decision to "clear" Plaintiff to return to the workforce to her psychiatrist, Dr. Carter;

f.      The opinions of both Dr. Smith and Dr. Moyer, Independent Physician Consultants retained by MetLife, that Plaintiff's medical records did not support a finding that she was unable to return to work in her prior occupation, which was sedentary in nature.

(See ML 79-80, 88, 104-06, 109-12, 120-21, 169.)

─────────────────────

position.

36

Moreover, while there is some evidence in the record that Plaintiff developed disabling depression during the tenure of her leave from work, the first evidence that the condition had reached a level of severity sufficient to render Plaintiff "disabled" did not come about until January 2002.  (See ML 83 & 88; Pl.'s Mot. for Summ. J. [31] at Ex. 9.)  Her earlier complaints or bare diagnoses of "depression," without more, fell decidedly short of establishing disability.  See, e.g., Bishop v. Metro. Life Ins. Co., 70 Fed. Appx. 305, 311 (6th Cir. 2003).[11]  In light of evidence in the administrative record supporting a finding, as early as late September or early October of 2001, that Plaintiff's physical condition did not leave her disabled, MetLife plainly had a reasonable basis for concluding, as it did, that Plaintiff was not entitled to benefits after September 30, 2001.  Evidence that Plaintiff may *later* have developed some disability does not render MetLife's decision arbitrary or capricious.  Cf., e.g., Flint v. ABB, Inc., 337 F.3d 1326, 1331 (11th Cir. 2003) (benefits properly terminated where participant failed to "provide proof of his continuing

---

[11] Indeed, the medical opinions before MetLife showed that, at about the time it initially suspended Plaintiff's benefits, her mental health was good.  (See ML 104) (reflecting Dr. Branch's assessment that Plaintiff, as of October 5, 2004, was "able to function under stress and engage in interpersonal relations (no limitations)").

disability"); Germaine v. Unum Life Ins. Co. of Am., No Civ. A. 2:03-CV-0104, 2004 WL 2624873, *1 & *10 (N.D. Ga. Sept. 23, 2004) (concluding, on analogous facts, that Plaintiff was not entitled to prevail on ERISA claim where evidence did not support that she was continuously disabled throughout the relevant period of time).[12]

2.    Comparative Evaluation of the Evidence before MetLife

Having determined that MetLife had some reasonable basis for its decision, but that it nevertheless is not entitled to summary judgment on the grounds that its decision was indisputably "correct," the Court must proceed to the third step in the "heightened" arbitrary and capricious analysis. That is, it must determine whether any reasonable juror could find MetLife failed in its burden to show "that the opinions and evidence it relied on denying the plaintiff's claim were, viewed both from a qualitative and quantitative perspective, at least as objectively reliable as the countervailing opinions and

---

[12] In Germaine, the court also concluded that the plaintiff's evidence of depression was insufficient to sustain her claim because she had originally sought disability benefits for fibromyalgia, stating, "the same disease or illness must cause the plaintiff to be on leave for disability throughout the elimination period . . . under the LTD plan." 2004 WL 2624873, at *10.  The Court need not go so far here, however, because the existence of a substantial "gap" in Plaintiff's evidence of disability left MetLife with a reasonable basis on which to conclude that she had not provided "ongoing certification of disability" as required by the Plan.  (See ML 537.)

38

evidence then before it." <u>Wise</u>, 360 F. Supp. 2d at 1323.  After carefully

considering the entirety of the administrative record, and drawing all reasonable

inferences in favor of Plaintiff, the Court answers that question in the negative.


a.    <u>Plaintiff's physical condition</u>

As it relates to Plaintiff's purported physical disability, at least two of her

treating physicians, Dr. Griffin and Dr. Pandya,[13] expressed their professional

opinion that she was capable of returning to sedentary work during times

relevant to this lawsuit.  These conclusions are bolstered by the evaluations and

analyses of two MetLife-retained Independent Physician Consultants.

Furthermore, in one of the few objective assessments of Plaintiff's physical

capabilities appearing in the record, Dr. Branch found Plaintiff capable, as of

early-October 2001, of engaging in the types of activity one would normally

associate with sedentary employment–*e.g.*, sitting for eight hours; standing and

walking for four hours, intermittently; reaching above her shoulder level;

---

[13] While Plaintiff informed MetLife that Dr. Pandya's assessment was based on an erroneously held belief that he was submitting the form in support of a workers' compensation claim, the Court struggles to see how this should in any way affect the reliability attributable to his conclusion.

operating a motor vehicle; lifting up to ten pounds occasionally; and performing fine finger movements, eye/hand movements, and pushing and pulling.  (See ML 105.)

On the other hand, the objective value of the evidence favorable to Plaintiff's position is open to legitimate debate.  As related above, at least two of the statements that she was incapable of returning to work (*i.e.*, those of Dr. Griffin and Dr. Pandya) were later abandoned or revised by the physicians who initially made them.  The records of Dr. Kahn and Plaintiff's physical therapists, moreover, while they plainly indicate some disadvantageous physical conditions (including those attributable to side effects of medication), fail to reflect the existence of any physical barriers leaving Plaintiff "unable" to work.

In addition, even the records of Dr. Branch, Dr. Boswell, and Dr. Solomon–who, admittedly, never expressly authorized Plaintiff to return to work–are not entirely consistent with a finding of continued disability, either during or after October 2001.  Dr. Branch remarked, as early as June 2001, that Plaintiff would be able to return to work in a matter of weeks, and subsequently expressed his belief that her condition was "continually improving."  (See Pl.'s App. 103.)  Similarly, although Dr. Boswell initially stated, in September 2001,

40

that Plaintiff should remain out of work for sixty days, one month later he

reported that, from an "objective" perspective, her symptoms had diminished,

and it was "uncertain" why Plaintiff was continuing to experience pain.  (See

ML 120-21.)  And Dr. Solomon, whom Plaintiff began to consult in early 2002,

appeared to attribute any inability to work, not to her physical condition, but her

mental health, delegating the decision to "clear" Plaintiff for work to her

psychiatrist.  (See ML 88.)

      What is more, even insofar as these gentlemen advised Plaintiff not to

return to work, their conclusions were rarely, if ever, accompanied by any

objective findings as to why she would be "unable" to perform a sedentary

occupation.  While their conclusions, to be sure, are not deprived of all

probative value in view of this omission, the absence of such explanation is

certainly a germane consideration in evaluating the comparative weight MetLife

was required to ascribe to their countervailing points of view.  Cf. Dwyer v.

Metro. Life Ins. Co., 4 Fed. Appx. 133, 141 (4th Cir. 2001) (upholding

judgment in favor ERISA defendant, and observing, while one of plaintiff's

physicians had provided a "letter [that] offer[ed] the conclusory opinion that

41

[the plaintiff was] totally disabled, none of her [objective] medical records suggest to this court a finding of total disability").

Succinctly stated, as it relates to Plaintiff's purported physical disability, no reasonable juror could find that the evidence MetLife relied upon in making its decision was, objectively speaking, comparatively inferior to that which might support a contrary resolution of Plaintiff's claim. The evidence in the record fully supports MetLife's determination, as related to Plaintiff, that,

> While your medical records are consistent with ongoing knee pain and while your standing and walking should be limited, we found no medical evidence or documentation that would preclude you from returning to your sedentary occupation.

(See ML 98.)

b.    Plaintiff's mental health

In light of the foregoing, Plaintiff's assertion that she suffers from disabling depression is insufficient to stave off summary judgment. The record, as explained above, is bereft of evidence supporting the existence of depression approaching "disabling" severity until January 2002. Because an evaluation of the administrative record sustains MetLife's determination that Plaintiff was not physically disabled as of October 2001, Plaintiff has not shown that she

42

submitted "ongoing certification of disability" as required by the Plan.

(See ML 537.)

> 3.     Other Purported Indicia of Self-Interest

This Court, in Wise, acknowledged that even where an insurer was able

to satisfy the "comparative objective reliability" standard, a plaintiff might

nevertheless be able to prevail (or at least avoid summary judgment) by

pointing to evidence showing "that the decision was arbitrary and capricious by

'other measures.' " Wise, 360 F. Supp. 2d at 1323.  Plaintiff has enumerated

several reasons why she believes the Court should find MetLife exhibited "self-

interest and unreasonable conduct" in the resolution of her request for benefits.

The Court, after considering the matter, finds none of the articulated reasons

engender a genuine issue of material fact as to the viability of Plaintiff's claim.

The great bulk of Plaintiff's enumerated arguments involve challenges

that MetLife "selectively reviewed," "refused to consider," "refused to accept,"

or "twisted" her statements and those of her treating healthcare professionals.

(See Pl.'s Mem. of Law in Supp. of Mot. for Summ. J. [37] at 13-15.)  That is

simply not the case.  The record reflects that MetLife thoroughly reviewed the

file, and submitted it to two Independent Physician Consultants to do likewise.

It additionally shows that MetLife attempted, albeit with little success, to contact her medical providers, and that it documented even those complaints Plaintiff voiced directly to agents of the insurance company.  While Plaintiff complains that MetLife paid insufficient attention to records pertaining to her mental health and side effects attributable to medication she was taking, moreover, these records, for all the reasons stated *supra*, simply fail to support a finding that she was disabled under the Plan.  Plaintiff's contention to the contrary lacks merit.

Plaintiff additionally contends that MetLife failed to investigate her vocational abilities and opportunities, and the tasks associated with her employment.  While the record is indeed somewhat sparse in this regard, the Court does not find that this sparsity gives rise to a genuine issue respecting whether MetLife acted arbitrarily or capriciously in denying her claim.  As the court stated in <u>Hufford v. Harris Corp.</u>, 322 F. Supp. 2d 1345 (M.D. Fla. 2001),

> While the Eleventh Circuit has not weighed in on the issue, "[i]n considering the 'any occupation' standard, other Courts of Appeals have held that consideration of vocational evidence is unnecessary where the evidence in the administrative record supports the conclusion that the claimant does not have a disability which prevents him from performing some

44

> identifiable job." [Cit.]  When, as here, the evidence
> shows that a claimant is capable of light and sedentary
> work and the claimant's previous employment was
> not highly skilled or technical, the plan administrator
> need not conduct a vocational assessment or consider
> vocational evidence to determine that the claimant is
> disabled under the "any occupation" standard.  [Cits.]

322 F. Supp. 2d at 1349.

Finally, Plaintiff claims that MetLife's errors in describing the standard

for "disability" in certain correspondence, and in stating that she had received

benefits for 12 months in denying her claim for a mental health disability in the

absence of hospitalization, precludes summary judgment in the insurance

company's favor.  The Court disagrees.  These misstatements, while

unfortunate, do not change the fact that the record, as a whole, supports

MetLife's conclusion that Plaintiff was able to resume her sedentary occupation

as of October 2001.

> [A] mere mistake on the part of the defendant's agents
> [cannot] be used to shoehorn plaintiff into a disability
> benefit to which he was not entitled under the plain
> language of the pension plan.
>
> "A central policy of ERISA is to protect the interests
> of employees and their beneficiaries in employee
> benefit plans."  [Cit.]  To allow plaintiff a disability
> benefit to which he is clearly not entitled, . . . would

45

> be in direct conflict with the goal expressed above. As
> the Eleventh Circuit Court of Appeals stated in
> Nachwalter, " . . . employees would be unable to rely
> on these plans if their expected retirement benefits
> could be radically affected by funds dispersed to other
> employees pursuant to oral agreements."  [Cit.]
> Although Nachwalter involved an oral agreement, the
> court finds that the same result should apply in a case
> involving letters which are inconsistent with the terms
> of a written pension plan.

Warren v. Health and Welfare Fund, 752 F. Supp. 452, 455 (M.D. Ga. 1990)

(citing Nachwalter v. Christie, 805 F.2d 956, 960 (11th Cir. 1986)), aff'd 946

F.2d 1547 (11th Cir. 1991).  While the Warren case involved a claim of

estoppel, the Court sees no reason to depart from its reasoning in deciding

whether a given misstatement gives rise to an inference of self-interest, at least

where there is no evidence that the mistaken assertions of the insurance

company's agents were anything but inadvertent.  Here, there is no such

evidence.

　　　　In sum, the Court concludes, as a matter of law, that MetLife has met its

burden of showing that its decision to deny Plaintiff benefits survives the

"heightened" arbitrary and capricious analysis under ERISA.  Defendants

Metropolitan Insurance Company and Sears Group Long Term Disability Plan's

Motion for Summary Judgment [32] is **GRANTED**.  Plaintiff's Motion for

Summary Judgment [31] is **DENIED**.

**Conclusion**

Defendants' Motion to Strike Exhibits 11, 12, and 13 Submitted in

Support of Plaintiff's Motion for Summary Judgment [37] is **GRANTED**.

Defendants' Motions for Summary Judgment [30, 32] are **GRANTED**.

Plaintiff's Motion for Summary Judgment [31] is **DENIED**.

**SO ORDERED** this  _31st_  day of March, 2006.


/s/ Richard W. Story
RICHARD W. STORY
UNITED STATES DISTRICT JUDGE

47